FARR & BAILEY MFG. CO. v. INTERNATIONAL NAV. CO.

(District Court, E. D. Pennsylvania. April 28, 1899.)

1. SHIPPING—INJURY TO CARGO—SEAWORTHINESS—EFFECT OF HARTER ACT.

Section 3 of the Harter act (2 Supp. Rev. St. p. 81) does not relieve the owner from the duty of furnishing a seaworthy vessel at the beginning of the voyage, nor affect his liability for damage to the cargo arising from unseaworthiness, but only exempts him from liability for damage arising from the risks therein designated when due diligence has been used to make the vessel seaworthy, etc. There is no expressed intention in the statute to replace the carrier's obligation under the general maritime law to furnish a seaworthy vessel by the less extensive obligation to exercise due diligence to that end, and it cannot be extended by construction beyond its terms.

2. SAME—FAULT IN MANAGEMENT OF VESSEL.

After a vessel had been out of port only four or five days, and had encountered no severe weather or known accidents, both covers of one of her ports were found to be open, and water had entered and damaged cargo in the compartment into which the port opened. Neither the covers nor the surroundings of the port were injured, and the hatches had been battened down since the beginning of the voyage. Held, that neither evidence that the vessel was inspected the day before sailing, and the port believed to be closed, nor even the positive testimony of witnesses that the covers were closed and screwed fast when the vessel sailed, was sufficient to establish such fact; but that, under the rule laid down in The Sylvia, 19 Sup. Ct. 7, 171 U. S. 462, the condition of the port did not render the vessel unseaworthy, and the failure to close it before the injury was received by the cargo was a fault or error in the management of the vessel during the voyage, for which the owners are relieved from liability under section 3 of the Harter act.

This was a libel in admiralty to recover for damage to cargo alleged to have arisen from unseaworthiness of the vessel.

John F. Lewis and Horace L. Cheyney, for libelant.
Biddle & Ward and J. Rodman Paul, for respondent.

McPHERSON, District Judge. This action is brought to recover damages to cargo under the following state of facts: The respondent is the owner of the steamship Indiana, a vessel plying between the ports of Liverpool and Philadelphia. In May, 1895, 20 bales of burlaps, in good condition, were received by the vessel in Liverpool, consigned to the libelant in Philadelphia, and a bill of lading was given therefor. The bales were stowed, with some other goods, in compartment No. 3 of the lower steerage deck; but the compartment was not full, only one tier of cargo, two or three feet high, covering the floor, so that access to the ports was easy and unobstructed. Four or five days after the vessel left Liverpool, water was discovered in the compartment; and when the hatches were opened, a day or two later, it was found that the after port on the starboard side was admitting water freely as the vessel rolled. Both covers of the port

were unfastened and open, but there was no sign of injury to either, or to the surroundings of the port. No severe weather had been encountered, and no accident was known to have happened to the vessel. The ports in the compartment were inspected the day before the vessel sailed, and were believed to be closed, but several hours elapsed between the time of inspection and the time of sailing. The libelant's burlaps were injured by the water thus taken into the ship, and the present suit has been brought to determine the respondent's liability.

It is conceded that the case requires the court to decide what bearing the so-called "Harter Act" of July 1, 1893 (2 Supp. Rev. St. p. 81), has upon the rights of the parties; for it is clear that, if this statute has made no change in the respondent's obligation to furnish a seaworthy vessel, the libelant is entitled to recover. As was said in The Edwin I. Morrison, 153 U. S. 215, 14 Sup. Ct. 829:

"The obligation rested on the owners to make such inspection as would ascertain that the caps and plates were secure. Their warranty that the vessel was seaworthy in fact did not depend on their knowledge or ignorance, their care or negligence. The burden was upon them to show seaworthiness, and, if they did not do so, they failed to sustain that burden, even though owners are in the habit of not using precautions which would demonstrate the fact."

This burden the present respondent also did not sustain, for the evidence before us does not show affirmatively that the vessel was seaworthy when the voyage began. The best that can be said of the proof is that it leaves in doubt the question how and when the port came to be opened, and such uncertainty would not relieve the carrier from liability, under the rule above quoted.

The respondent contends, however, that the third section of the act of 1893 provides the needful relief. The positions are—First, that the respondent used due diligence to make the vessel Indiana in all respects seaworthy, and properly manned, equipped, and supplied, and therefore that the respondent cannot be obliged to make good the libelant's loss, because such loss arose from a fault or error in navigation or in the management of the vessel; second, that, even if the loss occurred, not from a fault of navigation or management, but from unseaworthiness at the beginning of the voyage, the act has so modified the respondent's obligation to furnish a seaworthy vessel that, if due diligence was used in that behalf, the respondent is not liable to make good the loss.

Taking up the second position first, it must be conceded that the third section of the statute arouses some such expectation as the respondent supposes to be enacted into law. The section begins by saying "that if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped and supplied—"; and, after this beginning, one naturally expects to hear that, if the statutory condition of diligence be fulfilled, the vessel and her owners shall be relieved from at least some of the liabilities caused by unseaworthiness. But we do not hear this at all. Even if the framers of the statute in-

tended to replace the carrier's obligation to furnish a seaworthy vessel by the less extensive obligation to use due diligence to furnish such a vessel, the intention has not been expressed. The section goes on to provide, not that the carrier's warranty of seaworthiness shall be modified, but merely this: "Neither the vessel, her owner or owners, agent or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel; nor shall the vessel, her owner or owners, charterer, agent or master, be held liable for losses arising from dangers of the sea or other navigable waters," or from other causes not now important. In other words, the section does not touch, and therefore leaves unchanged, the carrier's liability for unseaworthiness; and this, as we understand the decisions of the supreme court, has already been decided by that tribunal.

In the case of The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, the general scope of the act was considered, and it was decided that its whole object was "to modify relations previously existing between the vessel and her cargo." It was accordingly held that the general language of section 3, which is broad enough to cover a case of collision, did not relieve an offending vessel from liability for such a wrong, although it was caused by a fault in the navigation or management of the vessel.

In The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, the court say distinctly, referring to section 3:

"The exemption of the owners or charterers from loss resulting from 'faults or errors in navigation or in the management of the vessel,' and for certain other designated causes, in no way implies that, because the owner is thus exempted when he has been duly diligent, thereby the law has also relieved him from the duty of furnishing a seaworthy vessel. The immunity from risks of a described character, when due diligence has been used, cannot be so extended as to cause the statute to say that the owner, when he has been duly diligent, is not only exempted in accordance with the tenor of the statute from the limited and designated risks which are named therein, but is also relieved, as respects every claim of every other description, from the duty of furnishing a seaworthy ship."

In the latest opinion upon the statute, to be found in The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, the effect of the decision in The Carib Prince was stated to be that the act "has not released the owner of a ship from the duty of making her seaworthy at the beginning of her voyage."

These cases furnish a sufficient reply to the respondent's second position. We understand them to rule that the obligation of the owner to furnish a seaworthy ship is now just what it was before the act of 1893 was passed. In order to fulfill that obligation, he must show more than due diligence. He must show, as heretofore, that he has in fact furnished a seaworthy vessel; and, if he fails in his proof, he is still liable for an injury arising from an unseaworthy condition.

This brings us to the consideration of the first position, which might present two questions of fact: First, was the respondent's ship unseaworthy when she left the port of Liverpool, and did this condition cause the loss? And, second, if the loss was caused, not by unseaworthiness, but by faults of navigation or management, had the

respondent used due diligence, as required by the act? As we look at the evidence, it will only be necessary to answer the first question. We have little difficulty in coming to the conclusion that the vessel was a staunch boat, properly manned, equipped, and supplied, and that she was in all respects fit for the voyage, except in the one respect of which the libelant complains,—the condition of the after port on the starboard side in compartment No. 3. Concerning the condition of this port at the beginning of the voyage, the testimony is unsatisfactory. Some of the respondent's witnesses testify with positiveness that both covers were closed and screwed fast when the vessel sailed, and, if this testimony is accepted as true, it establishes the fact that the port was properly fastened. But some of the witnesses upon this point are scarcely credible, and we regard the others as mistaken. The effect of the respondent's testimony is at least balanced, if not overbalanced, by the unquestioned fact that, although the ship had experienced no severe weather, and displayed no mark of injury to the port, nevertheless both covers were found open a few days after the vessel began her voyage. In our opinion, this condition of affairs can only be fairly explained, either by supposing that the witnesses who testified with such positiveness must have been mistaken, and that the port was not properly fastened when the vessel left Liverpool (although they may have honestly supposed it to be in a proper condition), or by supposing that, after the witnesses who testified that the port was closed had seen it for the last time, the covers were opened by some unknown person. Either supposition is more probable than to suppose that the port was broken in by a violence that left no sign, or was opened by a person who forced his way into the compartment after the hatches had been battened down. We therefore find, as a fact, that the port in question was either not fastened at all, or was insecurely fastened, when the vessel left Liverpool. In either event, it follows that the vessel was not seaworthy.

In our view of the case, this finding is decisive of the controversy; and accordingly we direct a decree to be entered adjudging the respondent to be liable for the damage complained of by the libelant, and referring the case to a commissioner to determine the extent of the loss.

## On Reargument.

(June 22, 1899.)

The only question to be considered upon this reargument is whether the court was right in concluding that the vessel was unseaworthy when she left Liverpool. If the point were now presented for the first time, so that it might be decided in accordance with the reasoning that appeals most strongly to my judgment, I should adhere to the conclusion already stated. It seems to me that, although the owners of the vessel provided the proper equipment for the porthole under consideration, and although the failure to close it properly was due to negligence in the use of such equipment, nevertheless the result was unseaworthiness, because the vessel set sail with a hole in her side that was not only unknown to her officers, but was believed not to exist. She was, therefore, not in a condition to afford due protection

to the cargo in this particular compartment.    If the hole had been caused by collision while she lay at her berth, and she had been sent upon her voyage without repair, it could not be successfully asserted that she was seaworthy, although the proper tools and materials might have been among the ship's stores, and the failure to repair might be properly said to have been due to negligence in failing to use the equipment at hand.    The state of affairs produced by negligence seems to me to be more important than the character of the negligent act; and therefore, if, at the time when a voyage is begun, there is an open port in a cargo compartment, I should incline to the opinion that one element, at least, of unseaworthiness was present.    This might not be decisive, it is true; for another important inquiry, I think, should be this:    Was it known to the proper officers that the port was either open or insecurely fastened?    Obviously it would be unreasonable to require a vessel to leave her berth with all her portholes closed, and to keep them closed at her peril during the voyage.    But a porthole that is known to be open in a cargo compartment, and a porthole that is mistakenly supposed to be closed when the voyage begins, are likely to receive different degrees of attention, and might properly give rise to different degrees of liability.    Such a port, when known to be open, must be borne in mind by those responsible for the care of the vessel and of her cargo, and must be promptly closed when danger threatens.    Therefore, the port should be readily accessible, so that it may be closed in a few minutes; and the ship would be unseaworthy if the cargo should be so disposed that the port could not be easily reached.    But a port in such a compartment, when mistakenly supposed to be closed, while it is actually open or insecurely fastened, is no longer an object of attention or care.    Whether, therefore, it be accessible or not, seems to be of little importance; for there is no intention to get to it for any purpose until the voyage is over.    Meanwhile the mischief may be doing.    The water may be invading the compartment and damaging the cargo, while the master of the vessel is relying upon his mistaken belief that the porthole was closed when the voyage began.    Such a mistake, as it seems to me, is not accurately described as a fault or error in the navigation or management of the vessel.    Failure to close an accessible port would, no doubt, be such a fault or error in management, if the port was known to be open; but, if the port was mistakenly supposed to be shut when the voyage was begun, this appears rather to be a fault in fitting the ship for the voyage, and a fault that is committed before the vessel sets sail. The master leaves the dock with a cargo compartment supposed to be tightly closed.    If he owes to the cargo a duty continually to inspect the ports, and damage is done by reason of neglected inspection, such neglect might be a fault in management.    But it has not been suggested that such a duty exists under ordinary circumstances, and I do not clearly see what other duty of management the master can be said to neglect.    There is a duty to provide against the danger that water may enter an open port; but, in the case supposed, the master believes that the duty to close was performed before the voyage began, and has no knowledge that the port is open.    If, therefore, he has no ground to suspect that the port is open, and is ordinarily under no duty

to inspect continually, it seems more reasonable to rest his liability for whatever injury may be done upon the mistake he made in preparing the compartment for the voyage. There is some force, I think, in the suggestion that such a mistake cannot properly be called a fault or error in navigation or management that had not then been begun. It might, perhaps, be said that the law regards such a mistake as repeated during every moment of the voyage; but I think this would be a subtlety of legal fiction, not necessary for the accomplishment of justice. It is no doubt true that it is not always easy to draw a line between defects that may properly be said to constitute unseaworthiness, and omissions or acts that may be more properly described as faults or errors of navigation or management. Failure to provide a compass, for example, might fall into either class; and so with other instances that might be specified. But this would only be to say again, what courts are continually saying, that no rule could be laid down for all cases, and for that reason I should prefer to confine my attention to the particular question before the court in a given case.

While the foregoing is perhaps a sufficient indication of the reasons that appeal to my judgment in behalf of the disputed conclusion, nevertheless I must admit that further consideration has convinced me that I am not at liberty to allow them to control the decision. Some of the cases cited by the respondent can be distinguished without difficulty, and some are not of binding authority; but I am unable to avoid the effect of the decision in The Sylvia, 171 U. S. 462, 19 Sup. Ct. 7. I am afraid that I somewhat more than half shut my eyes to the facts of that case. They are strikingly like the facts in the present controversy; so like, indeed, that I feel myself bound to accept the conclusions drawn from them by the supreme court. I obey the authority of that tribunal, therefore, and now hold that the condition of the porthole when the Indiana left Liverpool did not render the vessel unseaworthy. It follows that failure to close the port was a fault or error in management, committed during the voyage, and that the act of 1893 relieves the respondent from liability for such a fault. A decree will be entered dismissing the libel, with costs.